# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 20-1590V

| | |
|---|---|
| BRENT STAMM,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: October 1, 2024 |

*Braden Andrew Blumenstiel*, Dublin, OH, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND RULING ON ENTITLEMENT**[1]

On November 13, 2020, Brent Stamm filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine he received on November 15, 2017. Petition at 1-4. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that Petitioner more likely than not suffered the residual effects of his alleged vaccine-related injury for more than six months, and

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

that he has satisfied all of the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I.   Relevant Procedural History

On February 2, 2023, about 26 months after the case was initiated, Respondent filed his Rule 4(c) Report in which he argued that Petitioner could not satisfy the severity requirement or the Table elements of a SIRVA claim. Rule 4(c) Report at 5-10. Petitioner subsequently filed a Motion for a Fact Ruling ("Mot.") on July 18, 2023. ECF No. 37. Respondent filed a response ("Resp.") on October 17, 2023. ECF No. 40. Petitioner filed a reply ("Repl.") on December 11, 2023. The matter is now ripe for adjudication.

## II.   Relevant Facts

### a.  *Medical Records*

Petitioner received a flu vaccine in his left deltoid on November 15, 2018, at his pulmonologist's office in Columbus, OH. Ex. 3 at 7, Ex. 15 at 2. Petitioner's pre-vaccination medical records do not reveal any prior left arm or shoulder pain. *See* Ex. 9 at 9-16.

On November 29, 2017 (14 days after vaccination), Petitioner saw his primary care provider ("PCP") for left shoulder pain that he reported began the day of his vaccination and had worsened since. Ex. 5 at 13. He complained of "some tingling of his fingers the third fourth and fifth fingers [sic] on his hand," and "a sensation of his hand being cold." *Id*. On exam, Petitioner had tenderness to palpation and full range of motion. *Id.* at 14. He was prescribed naproxen and a Medrol Dosepak and referred to an orthopedist. *Id*.

Two days later, on December 1, 2017, Petitioner saw an orthopedist. Ex. 8 at 4. He reported "left shoulder pain that began about the same afternoon as a flu injection what was given into that shoulder." *Id*. On exam, Petitioner had full range of motion, full strength, and positive impingement signs. *Id*. at 5. Petitioner was diagnosed with subacromial bursitis and received a cortisone injection. *Id*. at 4. He returned to the orthopedist a month later, on January 9, 2018. *Id*. at 2. He reported that after the cortisone injection, "his symptoms seem[ed] to have gone away completely," but that he had increased pain after working out. *Id*. On exam, he had "full active and passive range of motion," and "really minimally positive impingement signs." *Id*. He was referred to physical therapy. *Id*.

On January 11, 2018, Petitioner had a physical therapy evaluation. Ex. 13 at 45. On exam, Petitioner displayed 175 degrees of shoulder flexion, 180 degrees of shoulder abduction, 78 degrees of external rotation, and 80 degrees of internal rotation, a positive

Hawkins-Kennedy test, and "pain that limit[ed] normal function." *Id*. at 45-46. His plan of care included treatments 1-2 times per week for four weeks. *Id*. at 46. He returned to physical therapy on February 1, 2018, with no change in symptoms. *Id*. at 27-28.

Petitioner returned to physical therapy three months later, on April 19, 2018. Ex. 13 at 41. He reported continued left shoulder pain that "causes avoidance and fear of activities." *Id*. Although he reported "30% overall improvement", Petitioner's left shoulder examination was consistent with findings from his initial evaluation. *Id*. In the clinical assessment, the therapist noted that Petitioner demonstrated full active range of motion. *Id*. at 42. Petitioner was instructed to continue his home exercise program "with f/u with skilled care for progression only as necessary." *Id*.

On November 30, 2018 (more than seven months later), Petitioner returned to his orthopedist. Ex. 13 at 11. He reported that he "got quite a bit better" after the cortisone injection, "but then plateaued and never completely got back to where he needed to be." *Id.* He also reported a "lack of confidence in the shoulder" and occasional lateral arm pain. *Id*. On exam, Petitioner had full active range of motion, full strength, and "positive Hawkins impingement." *Id*. at 11. The orthopedist ordered an MRI due to the duration of Petitioner's shoulder pain. *Id*.

An MRI on December 14, 2018, revealed mild tendinopathy in both the rotator cuff and biceps tendon, with a suspected small low-grade tear, mild to moderate degenerative changes of the acromioclavicular joint, and mild bursitis. Ex. 8 at 6-7. Petitioner received a second cortisone injection from his orthopedist on the same day. Ex. 13 at 9. The orthopedist referred him back to physical therapy for strengthening. *Id*.

Petitioner began a second course of physical therapy on January 7, 2019. Ex. 13 at 37. During an initial evaluation, Petitioner reported that after his cortisone shot the previous year, his shoulder pain "became completely tolerable," but never fully improved. *Id*. He reported pain with reaching out to the side and overhead, along with pain while sleeping and driving. *Id.* On exam, he had 180 degrees of shoulder flexion, 180 degrees of shoulder abduction, 86 degrees of external rotation, and internal rotation to T12, and positive Hawkins-Kennedy and painful arc tests." *Id*. Petitioner had a total of five physical therapy treatments through February 25, 2019. *See id*. at 19, 21, 23, 25. At the time of discharge, Petitioner noted only minor improvements and continued to have pain, particularly with driving. *Id*. at 19. He opted to continue his home exercises. *Id*.

Petitioner did not seek treatment for his left shoulder pain again until September 8, 2020, approximately 18 months later, when he visited a chiropractor. Ex. 7 at 3. He reported that he "had flu shot 3 yrs ago and developed L shoulder pain." *Id*. He described the pain as "dull & achy w/occasional sharpness." *Id.* On exam, Petitioner had decreased range of motion. *Id*.

3

At a wellness visit on January 22, 2021, Petitioner's PCP noted that "[h]e does have chronic left shoulder pain secondary to a vaccine related injury in 2017." Ex. 12 at 38.

*Relevant Witness Testimony*

Petitioner has filed an affidavit stating that his symptoms, including pain, tingling in his hand and arm, and a burning sensation in his shoulder, began within one day of his vaccination. Ex. 2 at ¶10. He adds that these symptoms continued through November 13, 2020 (the date of his affidavit). *Id*. at ¶13.

Petitioner filed a supplemental affidavit on July 17, 2023.[3] Ex. 18. In the more recent affidavit, Petitioner stated that his pain, numbness, and tingling began "within minutes of receiving the vaccination." *Id*. at ¶8. His range of motion was "limited due to pain." *Id*. at ¶11. He stated that "throughout 2018, [he] hoped his left shoulder would completely heal," and when it did not, he sought additional treatment. *Id*. at ¶17-18. He also states that he continued to have symptoms through the date of his second affidavit (July 17, 2023), which he managed with his home exercises and over-the-counter medications. *Id.* at ¶19-20, 28.

Petitioner's wife, Mandy Stamm, provided two affidavits in support of Petitioner's claim. Ex. 17, 19. Ms. Stamm recalled that Petitioner "has consistently experienced pain and limitations in his left shoulder" since his vaccination. Ex. 19 at ¶8. She stated that she has "personally observed [him] have limited range of motion in his left arm and shoulder." *Id*. at ¶9.

### III. Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

---

[3] Petitioner filed a supplemental affidavit at Exhibit 10 on May 31, 2022. That affidavit echoes the other affidavits discussed.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine

Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

In addition to requirements concerning severity of petitioner's injury, a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (*e.g.* tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV.   Findings of Fact

### A.   *Injury Localized to Vaccinated Arm*

At issue first is whether Petitioner's symptoms were limited to the shoulder in which he received the flu vaccination as required by the third QAI for a Table SIRVA. 42 C.F.R. § 100.3(a) XIV.B.; 42 C.F.R. § 100.3(c)(10)(iii). Respondent argues that "at Petitioner's first medical visit where he reported shoulder pain, he also indicated that he had numbness and tingling in his fingers (third through fifth digits) and a sense of coldness in his hand – all symptoms inconsistent with SIRVA." Resp. at 11.

Petitioner's medical records contain numerous references to his complaints about, and the treatment he received for, his left shoulder pain. Although Petitioner reported early numbness and tingling that resolved quickly, there is no evidence in the record that Petitioner continued to complain of, or received treatment for, any symptoms outside of his left shoulder. Petitioner thereafter received consistent treatment to his left shoulder, including examinations, x-rays, an MRI, and physical therapy sessions. Petitioner did not receive any neurological testing or treatment and was not diagnosed with any conditions outside of his shoulder.

While I acknowledge the record cited by Respondent does refer to pain at other places, it is outweighed by the evidence in Petitioner's treatment records establishing that pain and decreased range of motion were limited to the left shoulder. As I have previously explained, a petitioner need only present *preponderant* evidence to establish entitlement – and this includes evidence to suggest a claimant's pain was *largely* specific to the shoulder. *See Ash v. Sec'y of Health & Human Servs.,* No. 20-0867, 2024 WL 2938811, at *6 (Fed. Cl. Spec. Mstr. May 8, 2024); *Knudsen v. Sec'y of Health & Human Servs.*, No. 18-1971, 2021 WL 4448738, at *5 (Fed. Cl. Spec. Mstr. Aug. 23, 2021). Here, Mr. Stamm reported and was treated for pain and limited range of motion to his left shoulder, even if additional symptoms were initially reported. I therefore find there is preponderant evidence to support a finding that Petitioner has satisfied the third QAI Table requirement for a SIRVA injury.

B.    *Limited Range of Motion*

Respondent also argues that Petitioner has failed to demonstrate limited range of motion as required by third QAI for a Table SIRVA. 42 C.F.R. § 100.3(a) XIV.B.; 42 C.F.R. § 100.3(c)(10)(iii); *See also Bolick v. Sec'y of Health & Human Servs.*, No. 20-0893, 2023 WL 8187307, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (establishing that the third QAI requirement "requires that a Petitioner demonstrate they suffered both pain and limited range of motion."). Respondent argues that "four providers that examined Petitioner's left shoulder within the first two years after vaccination (Petitioner's PCP, orthopedist, and two physical therapists) recorded that he had no limitations to his active range of motion." Resp. at 13.

A careful review of the medical records shows that, as of January 11, 2018 – his first physical therapy appointment - Petitioner displayed limited external rotation in his left shoulder. *See* Ex. 13 at 45. Although the physical therapist noted in a narrative section that Petitioner "demo's approp [sic] strength and AROM," she also noted the numerical measurements of movement, in degrees, that Petitioner had at the time. *Id*. at 45-46. During that exam, Petitioner demonstrated 175 degrees of shoulder flexion, 180 degrees of shoulder abduction, 78 degrees of external rotation, and 80 degrees of internal rotation." *Id*. at 45. Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY, 72, 80, 84, 88 (F.A. Davis Co., 5th ed. 2016). Petitioner's range of motion measurements did not change through the remainder of his first course of physical therapy. *See* Ex. 13 at 27-28, 41-42. In addition, Petitioner's therapy included procedures to improve his range of motion. *Id*. at 27, 41, 45. During his first course of physical therapy, Petitioner's measured external rotation of 78 degrees was below the normal range of 90 to 100 degrees – meaning there is evidence in the record that his range of motion was limited.

In *Bolick v. Sec'y of Health & Human Servs.*, No. 20-0893, 2023 WL 8187307, at *8-9 (Fed. Cl. Spec. Mstr. Oct. 19, 2023), I found that petitioner had not established limited range of motion because "there [was] no objective or subjective evidence that [he] *ever* suffered limited range of motion" during his treatment course. While Mr. Stamm's medical records, admittedly, reveal that he had full or normal range of motion on *most* occasions during his treatment, the record objectively establishes that he experienced slightly limited external rotation in his left shoulder. As such, I find that Petitioner has provided preponderant evidence to satisfy the third QAI Table requirement for a SIRVA injury.

C.  *Severity*

Respondent finally argues that Petitioner has not satisfied the statutory severity requirement because Petitioner treated his left shoulder pain for only five months after his vaccination before a gap in treatment. Resp. at 10.

To satisfy the statutory severity requirement, Petitioner must demonstrate that his symptoms more likely than not continued until at least May 15, 2018. There is no dispute that Petitioner sought treatment for left shoulder pain through April 19, 2018, a period of five months, before a seven-month gap in treatment until November 30, 2018. Ex. 13 at 11, 37. Therefore, the crucial question is whether Petitioner had ongoing symptoms between April 19, 2018 and May 15, 2018. The record supports the conclusion that he did.

At Petitioner's physical therapy appointment on April 19, 2018, he reported only 30% improvement since beginning his treatment and had not yet resumed gym workouts. Ex. 13 at 41. He continued to report pain with ADLs and was easily fatigued during exercises. *Id*. at 42. He had not met his therapy goals and was instructed to continue his home exercise program "with f/u with skilled care for progression only as necessary." *Id*. The record itself establishes that Petitioner continued to have left shoulder symptoms on that date, and that he intended to engage in future therapy to complement a home exercise program. His remaining long-term goals contemplated at least "4 weeks" – or beyond May 15, 2018 – to fulfill this plan. *See id.* In addition to the medical record evidence, Petitioner and his wife provided affidavit testimony that his symptoms continued beyond six months after his vaccination and that he continued to perform his home exercises. *See* Ex. 2, 17-19.  Specifically, Petitioner recalled that "throughout 2018, [he] hoped his left shoulder would completely heal," and when it did not, he sought additional treatment. Ex. 18 at ¶17-18.

Further, when Petitioner returned to treatment in late 2018 and early 2019, he consistently reported that while his symptoms had improved with previous treatment, they had not fully resolved. On November 30, 2018, Petitioner reported to his orthopedist that he had gotten "quite a bit better" after the cortisone injection, "but then plateaued and never completely got back to where he needed to be." Ex. 13 at 11.  On January 7, 2019, Petitioner reported to a new physical therapist that after his cortisone shot the previous year, his shoulder pain "became completely tolerable," but it had never really gone away completely." *Id*. at 37. In contrast, there is no evidence in the record suggesting that Petitioner's shoulder pain had resolved by April 19, 2018, as argued by Respondent.

Thus, after consideration of the entire record, I find that the evidence preponderates in Petitioner's favor on this issue. Of course, gaps in treatment will likely

impact the amount of damages he may receive (and therefore Petitioner must be realistic about the fairest, and most likely, outcome for any damages award to be received in this matter).

## V.     Ruling on Entitlement

### A.     *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that his symptoms were limited to the left shoulder, where he received the flu vaccination, and that Petitioner experienced limited range of motion as required. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10). Accordingly, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury.

### B.     *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccination on November 15, 2017 in Columbus, OH. Ex. 3 at 7, Ex. 15 at 2; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that he has not filed any civil action or received any compensation for his vaccine-related injury, and there is no evidence to the contrary. Ex. 10 at ¶17; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master